# IN THE COURT OF APPEALS OF IOWA

No. 22-0292
Filed November 2, 2022

IN RE THE MARRIAGE OF ESPERANZA CHAIREZ DE AGUILERA
AND ODILON AGUILERA LOPEZ

Upon the Petition of
**ESPERANZA CHAIREZ DE AGUILERA,**
     Petitioner-Appellee,

**And Concerning**
**ODILON AGUILERA LOPEZ,**
     Respondent-Appellant.
_____

     Appeal from the Iowa District Court for Marshall County, Bethany J. Currie, Judge.

     An ex-husband appeals the directives in the dissolution decree on spousal support, child support, medical support, surgery costs, and attorney fees. **AFFIRMED AS MODIFIED AND REMANDED.**

     Norma J. Meade of Moore, McKibben, Goodman & Lorenz, LLP, Marshalltown, for appellant.

     C. Aron Vaughn of Kaplan & Frese, LLP, Marshalltown, for appellee.

     Considered by Bower, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

Odilon and Esperanza Aguilera Lopez divorced after twenty-six years of marriage. Neither contests the custody award or property division. But Odilon disputes five financial obligations in the decree. First, he contends he should not have to pay rehabilitative alimony of $1000 per month. Second, he claims the district court erred in ordering him to pay the cost of Esperanza's future foot surgery. Third, he argues the district court failed to determine Esperanza's earning capacity in calculating her child support and medical support, and their income tax dependencies. Fourth, he challenges the terms of repayment for Esperanza's past-due child support. And fifth, he believes each party should pay their own attorney fees.

Because the spousal support was equitable, we affirm that award. But we modify the decree to strike the order that Odilon pay for Esperanza's surgery, because those costs were too speculative. We also remand for the district court to recalculate Esperanza's child support payments and her responsibility for the children's uncovered medical costs. As for past-due support, we modify the decree to strike the repayment plan. On trial attorney fees, we affirm the amount ordered by the district court, but modify the terms of payment. We deny Esperanza's request for appellate attorney fees.

### I.      Facts and Prior Proceedings

*California, 1995.* Esperanza, then seventeen, married Odilon, who was six years older.[1] They soon moved to Iowa where he had family and a job waiting at

---

[1] Neither party finished high school.

JBS, a meat-packing plant in Marshalltown. He continued to work there for the duration of the marriage. Esperanza also worked for JBS early on. She later spent a decade working as a para-educator for the Marshalltown Community School District and then as a laborer at Iowa Premium Beef. The meat-packing jobs left Esperanza with health issues, including carpal tunnel syndrome and tendonitis. She also spent time outside of the workforce, raising their children.

Esperanza and Odilon have seven children, four of whom reached adulthood by the time of their divorce. The couple separated in 2016, and the three youngest children have lived with Odilon since 2018.[2] Esperanza moved in with her mother and brother in Albion and relied on them for help with basics such as food and clothing. Given those living arrangements, the Iowa Child Support Recovery Unit (CSRU) issued an administrative order directing Esperanza to pay $940 per month in child support starting in June 2020. She petitioned to dissolve the marriage in July 2020. Three months later, she quit her job at Iowa Premium, asserting she was unable to perform the work because of foot pain from bone spurs.[3] Without a paycheck, she fell behind in her support obligation.[4] By the time of the dissolution trial, she owed $14,442.50 in back child support.

*Iowa, 2022.* Both Esperanza, now forty-three, and Odilon, now forty-nine, testified at the divorce trial. They discussed their work histories and Esperanza's

---

[2] Two adult children also lived with Odilon.
[3] Esperanza described her condition: "What I was told is on the part of the heel there's kind of like a little ingrown bone on the heel coming out. So I have one on each foot and they swell up when I stand for a long time."
[4] According to Esperanza, her only work after October 2020 was a two-day stint at a Mexican restaurant in Toledo. She had to quit that job because her bone spurs made it too painful to be on her feet for the whole shift.

need for spousal support. She asked for traditional alimony. After hearing from both parties, the court directed Odilon to pay Esperanza spousal support in the amount of $1000 per month for three years. Beyond that rehabilitative support, the court ordered Odilon to pay for surgery to remove bone spurs from Esperanza's heels. She testified that she could not afford the procedure because she did not have medical insurance after Odilon removed her from his coverage.[5] She also testified that she expected to return to work if she had the foot surgery.

The court assigned physical care of the three youngest children to Odilon, and ordered Esperanza to pay $181 per month in child support.[6] The court also ordered Esperanza to pay $36 per month toward her overdue child-support obligation. The decree required Odilon to maintain health insurance for the three children, and ordered him to pay $250 per child per year in uncovered medical expenses. The parties were to split the remainder of the uncovered medical expenses, with Odilon covering 73% and Esperanza covering 27%. As for tax dependencies, the court ordered that each parent claim one of the two older children and alternate years with the third child. The court added: "If Esperanza is unemployed and the tax dependency exemptions would otherwise go to waste, Odilon shall be entitled to claim all eligible children on his tax return." Finally, the court ordered Odilon to pay $2500 toward Esperanza's trial attorney fees, finding he had the greater ability to pay. Odilon appeals.

---

[5] Odilon testified that he stopped coverage for his wife on his health plan when she moved out of the house, but was still working.

[6] That amount dropped to $157 for two children and to $111 when only one child remained in Odilon's physical care.

## II.     Scope and Standards of Review

Because dissolution-of-marriage cases are tried in equity, our review is de novo. Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). We give weight to the district court's fact findings, particularly on witness credibility, but they do not bind us. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Because the district court holds a better vantage point for assessing the parties' positions when considering spousal support, "we should intervene on appeal only where there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

## III.    Analysis

### A.  Spousal Support

Whether to award alimony is a matter of discretion. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). Our supreme court has recognized four types of alimony: traditional, rehabilitative, reimbursement, and transitional. *Id.* at 545. These parties discuss two types: traditional and rehabilitative. Traditional (also known as permanent) alimony provides the receiving spouse with support, usually payable until death or remarriage, comparable to what they would have experienced if the marriage had continued. *Gust*, 858 N.W.2d at 408. It is generally awarded if a spouse is unable to become self-sufficient at the standard of living enjoyed during the marriage. *Id.* at 411. By contrast, rehabilitative support aims to stabilize an economically dependent spouse by funding a limited period of remedial training or education following divorce. *See In re Marriage of Becker*, 756 N.W.2d 822, 826 (Iowa 2008). The goal is to create "incentive and opportunity for that spouse to become self-supporting." *Id.*

At trial, Esperanza asked for spousal support of $1000 per month "to continue indefinitely." She pointed to Odilon's annual earnings of $48,000 per year compared to her lack of income. Odilon countered that when comparing their earning capacities, no support was warranted. As a fallback position, his attorney argued that if any spousal support was awarded it should be "something of a rehabilitative sort."

The district court rejected Esperanza's request for traditional alimony, and limited the rehabilitative award to $1000 per month for three years. The court noted the duration of the payments "should enable Esperanza to get training and find a job where she can sit and earn income comparable to her income from Iowa Premium, or the time may be spent having surgery and recovering so she can return to a position where she needs to stand all day."

Odilon now contends the district court should not have awarded any alimony. He bolsters his contention with two threads. First, he asserts that "he has no disposable income or savings from which to pay alimony to Esperanza." He alleges monthly expenses of $3580 in maintaining a household for the five family members (three minor children and two adult children) who live with him. Second, he claims Esperanza "has the earning capacity to be self-supporting." He points to her job history and questioned the contention that she was unable to work without foot surgery.

Defending the award, Esperanza argues that the district court "rightly considered [her] physical health in determining her current income potential." She also points to her limited education as a hurdle in landing a well-paid position. Weaving those concerns together, she insists that she "would certainly require a

period of education to secure non-labor-intensive employment at a similar wage to her job at the packing plant."

The criteria for settling their dispute are in Iowa Code section 589.21A (2022). Those statutory factors include the length of the marriage; the age and health of the parties; the property distribution; the parties' education levels at the time of marriage and divorce; the earning capacity of the party seeking support, including "the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment"; the feasibility of that party becoming "self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage"; tax consequences to each party; any agreement by the parties concerning contributions and expected reciprocation; the provisions of an antenuptial agreement; and other relevant factors. Iowa Code § 598.21A(a)–(j). In setting a three-year duration for the rehabilitative award, the district court considered all the pertinent factors, including their long-term marriage, both parties' ages and limited education, as well as Esperanza's limited earning capacity and the feasibility of her becoming self-supporting.

We find the award is equitable. As the district court noted, Odilon received a larger share of the parties' real and personal property.[7] It was proper to consider the property division and alimony together in evaluating their individual sufficiency. *See In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998). What's more, compared with Odilon's steady job history and good health, Esperanza has

---

[7] The parties owned two houses, the family home valued at $69,930 and a rental property valued at $51,410. The decree awarded the family home to Odilon and other property to Esperanza. The decree also awarded Odilon more vehicles with greater value.

suffered employment insecurity and physical issues limiting her work options. The short duration of the rehabilitation alimony should provide her with the opportunity and incentive to rejoin the work force. *See In re Marriage of Smith*, 573 N.W.2d 924, 927 (Iowa 1998) (upholding three-year award of rehabilitative alimony).

## B. Costs of Surgery

On top of the alimony award, the court directed Odilon to pay for Esperanza's surgery to remove bone spurs from her heels. She testified at trial that her general practitioner referred her to a specialist, but she "couldn't make it because [she] didn't have money." She did not know how much the surgery would cost. Odilon argues: "the future medical debt should not have been allocated by the trial court in a property division context given the speculative nature of the future expense and because it was not incurred during the marriage." We agree.

In assigning those costs to Odilon, the district court quoted *In re Marriage of Johnson*, for the proposition that Iowa Code section 597.14 (entitled "Family expenses") holds a spouse liable for payment of the other spouse's medical expenses incurred during the marriage. 781 N.W.2d 553, 558 (Iowa 2010). From there, the district court found it equitable to require Odilon to pay Esperanza's uninsured medical costs related to the future surgery because he "unilaterally decided to remove [her] from the family's health insurance during the marriage."[8]

---

[8] The court also ordered Esperanza to "take steps to reduce the cost if possible." Those steps included applying for "Medicaid or a similar government-sponsored low-cost or no-cost health insurance plan" within thirty days of the decree. After finding out if she was approved or denied for insurance, Esperanza was to "reschedule her appointment with the surgeon and determine the out-of-pocket costs of the surgery as well as any other necessary pre-surgical and/or follow-up appointments." She was to share that information with Odilon, who would "be

As Odilon argues, the district court's reliance on *Johnson* and section 597.14 is misplaced. *Johnson* addressed an unrelated question: whether medical support payments terminated on remarriage. *Id.* at 557. And the cited interpretation of section 597.14 was limited to expenses incurred *during* the marriage. The order for Odilon to pay Esperanza's *future* medical expenses was not contemplated by that statute nor was it equitable under the circumstances.

Let's examine those circumstances. Odilon asserts the record shows Esperanza's employer was deducting medical-insurance premiums from her paycheck before she quit in the fall of 2020. So she did not rely on coverage through his work. Esperanza does not address that assertion in her appellee's brief. Instead, she insists: "Had Odilon not unilaterally removed Esperanza from his health insurance plan, she would have been able to have the surgery and likely would be recovered and employed by the time of trial." We see no support in the record for that claim. Esperanza presented no evidence showing the surgery was necessary for her to continue working, whether it would have been covered under Odilon's policy, or how much the out-of-pocket costs would have been.

Also, in awarding rehabilitative alimony, the court contemplated Esperanza's difficulty in supporting herself given her physical limitations. Thus, we strike the provision of the decree requiring Odilon to also cover the future expenses associated with the surgery contemplated by Esperanza. *See In re Marriage of Sisson*, 843 N.W.2d 866, 875 (Iowa 2014). On this uncertain record,

---

responsible for all of the out-of-pocket costs for the surgery and related appointments."

it is inequitable to hold Odilon liable for the speculative costs of Esperanza's unscheduled future surgery.

### C. Child Support, Medical Support & Income Tax Dependencies

Odilon next argues the district court failed to consider Esperanza's earning capacity when calculating her child support obligation. He complains that the court treated the $1000 monthly spousal support as her sole source of income. In his view, "her job loss was self-inflicted" and calculated to reduce her obligation. He spotlights his trial testimony that Esperanza was upset when he applied for child support, and told him she was going to quit her job to avoid paying. She indeed quit her job in October 2020 and remained unemployed at the time of the January 2022 trial. Given that evidence, he argues the court should not have reduced the child-support payments from the CSRU administrative order. In the same vein, he argues the court should have refused to modify the medical support order.[9]

Esperanza defends the child support and medical support orders, presuming the district court did not believe Odilon's contention that she voluntarily quit her meat-packing employment. She insists the credible evidence in the record shows that her bone spurs prevent her from performing "an even mildly labor-intensive job." She suggests "the available alternatives for employment that do not

---

[9] From the administrative order, the court continued the requirement that Odilon pay the first $250 per year in uncovered medical expenses. But it changed the percentage split of the remaining uncovered expenses—from fifty-one for Odilon and forty-nine for Esperanza to seventy-three percent for Odilon and twenty-seven percent for Esperanza.

require employees to spend more than thirty minutes on their feet at a time will be severely limited in compensation, given [her] limited educational background."

What Esperanza overlooks is her decade of work in the public schools as a para-educator, which she testified paid "around $700" per month. She explained that she helped tutor students who "did not know any English." She did not testify that her bone spurs would affect that line of work. And the district court found that she "might be able to return" to a para-educator job. We agree with that fact finding. Like the district court, we do not question Esperanza's claim that bone spurs prevent her from doing physically demanding jobs. But the record does not show that she is incapable of any work. We thus find that she was voluntarily unemployed without just cause. And the district court should have imputed some income to Esperanza.

The imputing of income falls under Iowa Court Rule 9.11(4).[10] Under that rule, the court may base a child-support calculation on earning capacity rather than

---

[10] That rule states:

> The court may impute income in appropriate cases subject to the requirements of rule 9.5. If the court finds that a parent is voluntarily unemployed or underemployed without just cause, child support may be calculated based on a determination of earning capacity.
> *a.* Incarceration is not voluntary unemployment for purposes of establishing or modifying child support.
> *b.* A determination of earning capacity must take into consideration the specific circumstances of the parent to the extent known, and may include such factors as employment potential and probable earnings level based on work and training history, occupational qualifications, prevailing job opportunities, availability of employers willing to hire the parent, and earning levels in the community.
> *c.* The court may also consider the parent's assets, residence, educational attainment, literacy, age, health, criminal record and

actual earnings if it determines that otherwise substantial injustice would occur, or adjustments would be necessary to provide for the needs of the children or to do justice between the parties. Iowa Ct. R. 9.11(4)(d). On our de novo review of the record, we are convinced Esperanza's earning capacity should have been used in calculating child support to provide for the needs of the children and to do justice between the parties. *See German v. Metcalf*, No. 09-1470, 2010 WL 1875640, at *3 (Iowa Ct. App. May 12, 2010). Given her experience as a para-educator, we determine her earning capacity is at least $700 per month, on top of the $1000 monthly spousal support she receives. *See In re Marriage of Fogle*, 497 N.W.2d 487, 489 (Iowa Ct. App. 1993) (considering parent's earning capacity and responsibility to support child). We remand to the district court to recalculate Esperanza's child-support and medical-support obligations using this revised gross income figure of $1700 per month.

Given this imputation of income, we find the current allocation of tax deductions to be equitable.

### D. Past-Due Child Support

Odilon also contests the district court's decision to set up a payment plan for Esperaza's child-support arrearages—pointing out that neither party requested

---

other employment barriers, record of seeking work, and other relevant factors.

    *d.* The court may not use earning capacity instead of actual earnings or otherwise impute income unless a written determination is made that, if actual earnings were used, substantial injustice would occur or adjustments would be necessary to provide for the needs of the child(ren) or to do justice between the parties.

Iowa Ct. R. 9.11(4).

that action. In the alternative, Odilon argues if that issue was properly before the court, ordering monthly installments of $36 was not an equitable solution.[11]

Esperanza agrees that neither party requested the action, but adds that neither party resisted the concept of a repayment schedule. She points out that Odilon broached the issue at trial when his counsel questioned her about the overdue back support.[12] And she insists Odilon needed to file a motion to amend or enlarge the decree to preserve this issue for appeal. *See* Iowa R. Civ. P. 1.904(2). If the issue was preserved, Esperanza asks us to affirm the repayment plan.

Neither party cites authority for their positions on appeal. True, Esperanza invokes rule 1.904(2). But she does not point to any cases holding that a motion to enlarge is necessary to preserve error when a district court *decides* an issue *not raised* by the parties. This scenario presents the inverse of the usual purpose for filing a rule 1.904(2) motion: to secure a ruling on an issue *raised* by the parties

---

[11] Odilon calculated: "At this rate, it would take 401 months, or 33 years for the past due amount of support to be paid." He reasons that because the children in his care are now eight, twelve and fourteen years old, they will not benefit from those delayed payments. In his view, a more equitable solution would be to order Esperanza to pay the back support while the children are still living with him.

[12] Here is that exchange:

> Q. To go back to something regarding alimony. You're wanting to have him pay you spousal support? A. Yes, correct.
>
> Q. While you owe between 14 and $15,000 right now at least in child support payments, in back support payments; correct? A. Yes.
>
> Q. So it sounds to me like your plan is to pay that debt to him with his money; is that right? A. No.
>
> Q. Well, what money would you use then to pay the arrears, the back support? A. I don't have any money to pay for that now.
>
> Q. So you just would not pay the back support, is that what I'm hearing? A. I'm not saying I'm not going to pay it. I'm just saying I cannot do it at the moment.

but *not decided* by the district court. *See Schaffer v. Frank Moyer Const., Inc.*, 628 N.W.2d 11, 22 (Iowa 2001). If a party doesn't need to request findings to obtain review of a court decision, the circumstances for a rule 1.904(2) motion do not arise. *See Lamasters v. State*, 821 N.W.2d 856, 864 n.2 (Iowa 2012). Thus, Odilon did not have to file a motion to amend to raise this issue on appeal. *See Veatch v. Bartels Lutheran Home*, 804 N.W.2d 530, 534 (Iowa Ct. App. 2011) (finding parties were not required to file a motion to amend to preserve an issue for appeal "because the district court ruled on the issue").

Because no party proposed the payment plan for Esperanza's overdue support, the issue was not before the court. So we strike the provision of the decree providing for installment payments. *Cf. Moses v. Rosol*, No. 21-1091, 2022 WL 949749, at *3 (Iowa Ct. App. Mar. 30, 2022) (partially vacating decision modifying legal custody when only issue raised by the parties was physical care).

### E. Attorney Fees

Finally, Odilon argues he should not have been ordered to pay $2500 of Esperanza's attorney fees. Finding that amount equitable, the court directed Odilon to "set up a payment arrangement" agreeable to Esperanza's counsel. Short of reversing that order, Odilon asks that we designate a payment schedule.

"Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Sullins*, 715 N.W.2d at 255 (citation omitted). The district court has discretion to award fees and we will not disturb the award unless we find an abuse of that discretion. *In re Marriage of Francis*, 442 N.W.2d 59, 67 (Iowa 1989). Because of the disparity in income between the parties and Odilon's ability to pay, we cannot say the trial court abused its discretion in awarding

attorney fees to Esperanza. But rather than delegating the payment plan to opposing counsel, we order Odilon to pay the attorney fees in five monthly installments of $500, starting after issuance of procedendo on this appeal and due on the same date as his spousal support.

As for appellate attorney fees, Esperanza asks for a contribution of $2000 from Odilon toward her representation in this action. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). We consider Esperanza's needs, Odilon's ability to pay, and the relative merits of their positions on appeal. *See id.* Given Odilon's other financial obligations, and the split decision on appeal, we find it equitable for each party to pay their own appellate attorney fees. Costs are equally divided.

**AFFIRMED AS MODIFIED AND REMANDED.**